## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| ) | |
| ) | **MDL No. 2371** |
| IN RE UNIFIED MESSAGING ) | |
| SOLUTIONS, LLC ) | **Master Docket No. 12 C 6286** |
| PATENT LITIGATION ) | |
| ) | **Hon. Joan H. Lefkow** |
| ) | |

## OPINION AND ORDER

Plaintiff, Unified Messaging Solutions, LLC ("UMS"), filed lawsuits against numerous

defendants alleging infringement of United States Patent Numbers 6,857,074 ("the '074 patent");

7,836,141 ("the '141 patent"); 7,895,306 ("the '306 patent"); 7,895,313 ("the '313 patent"); and

7,934,148 ("the '148 patent") (collectively referred to as the "'patents in suit'"). The Judicial

Panel on Multidistrict Litigation ("JPML") consolidated the actions before this court for pretrial

proceedings. Presently before the court are the motion of defendants, Juno Online Services, Inc.,

Netzero, Inc., and Memory Lane, Inc.'s ("the UOL defendants") for sanctions and dismissal

under Federal Rule of Civil Procedure 11 [dkt. 536] and the first and second wave defendants'[1]

motion for judgment on the pleadings under Rule 12(c) [dkt. 561]. Both motions seek dismissal

---

[1] The first and second wave defendants consist of the following defendants: Orbitz, LLC; State Street Corporation; Ameriprise Financial Inc.; Cequel Communications LLC d/b/a Suddenlink; Conn's Inc. and Conn Appliances, Inc.; United Air Lines, Inc.; Groupon, Inc.; Cupid PLC; HSBC North America Holdings Inc. and HSBC USA Inc./HSBC Bank USA, National Association; Yahoo! Inc.; Sportsville, LLC, Branch Banking and Trust Co.; BMO Harris Bank N.A.; Humana Inc.; Scottrade, Inc.; Sprint Nextel Corporation; Coxcom, LLC and Earthlink, Inc.; First Tennessee Bank National Association; Friendfinder Networks Inc. and Various, Inc.; Windstream Corporation; the Vanguard Group, Inc. and Vanguard Marketing Corporation; PNC Bank, N.A. and RBC Bank (USA); Bancorpsouth, Inc.; General Electric Capital Services, Inc.; Government Employees Insurance Company and GEICO Advantage Insurance Company; Ameritrade Holdings Corporation and TD Ameritrade, Inc.; and Twitter Inc. UMS filed lawsuits against alleged infringers in waves. The first wave defendants had cases pending before the JPML consolidated all pretrial proceedings and the second wave defendants are those defendants that UMS filed suit against after the consolidation.

of UMS's claims based on its alleged violation of the terminal disclaimers for the '141 patent, the '306 patent, the '313 patent, and the '148 patent.[2]  Because determination of the issues presented by defendants demonstrates that UMS lacks standing to maintain the lawsuits as an exclusive licensee without joinder of the owner of the patents in suit or its successor, UMS is given leave to join that party to effectuate standing.  Defendants motions are otherwise denied.

## BACKGROUND

### I.      The Patents at Issue

The patents in suit are part of the same patent family claiming a message storage and delivery system.  The patents in suit are also part of a larger patent family directed to the same invention.  They stem from an original application filed in 1995 that issued as United States Patent Number 5,675,507.  Among the patents in this larger patent family is United States Patent 6,350,066 ("the '066 patent"), which issued before the patents in suit.[3]  The patents in suit resulted from continuation applications relating to the '066 patent.  The '141 patent, the '306 patent, the '313 patent, and the '148 patent  ("the terminally disclaimed patents") are subject to a terminal disclaimer based on the life of the '066 patent.  The '074 patent is not subject to a terminal disclaimer.

### II.     The Assignment of the Patents at Issue

A number of companies at one point held an interest in the '066 patent and the patents in suit.  Between 2004 and 2006, j2 Global, Inc. ("j2") acquired the '066 patent, the '074 patent, and the applications that issued as the terminally disclaimed patents.  Advanced Messaging

---

[2]  The court has jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  Venue in this district is appropriate under 28 U.S.C. § 1407(a).

[3]  The '066 patent issued on February 26, 2002.

Technologies, Inc. ("AMT") is j2's wholly owned subsidiary. AMT prosecuted the patent applications that ultimately issued as the terminally disclaimed patents. As more fully detailed below, j2 assigned the rights[4] to certain of the patents in suit to Acacia Patent Acquisition, LLC ("Acacia PA"), which is a subsidiary of Acacia Research Corporation ("Acacia"). UMS is a wholly owned subsidiary of Acacia.

In July 2009, j2 assigned the '074 patent[5] and the application that later issued as the '306 patent to Acacia PA. j2 retained ownership of the '066 patent and the applications that later issued as the terminally disclaimed patents immediately after this transaction. In September 2009, Acacia PA assigned the '074 patent and the application that issued as the '306 patent to UMS. On May 10, 2010, AMT and UMS entered into an agreement in which (1) UMS transferred the entire, right, title and interest in, *inter alia*,[6] the '074 patent and the application that issued as the '306 patent to AMT; and (2) AMT simultaneously gave an exclusive license to UMS of the '074 patent and the application that issued as the '306 patent. AMT did not transfer any interest in the '066 patent to UMS in connection with this agreement.[7]

On October 29, 2010, AMT and UMS amended their agreement and voided the May 10, 2010 agreement and entered into another agreement. The latter agreement included the '066 patent with the portfolio of patents subject to the agreement. In the October 29, 2010 agreement,

---

[4] The court takes judicial notice of the United States Patent and Trademark Office website printouts attached as exhibits, which detail the assignment history of the patents in suit and the '066 patent. *See* Fed. R. Evid. 201(b); Dkt. 536–7.

[5] The '074 patent issued on February 15, 2005.

[6] The patent portfolio agreement also contained patents not at issue here.

[7] On May 6, 2010, j2 assigned its interest in the '066 patent to AMT.

the parties agreed that (1) UMS transfers the entire right, title, and interest in the '074 patent and the applications that issued as the terminally disclaimed patents; and (2) AMT simultaneously grants UMS an exclusive license in the patents in suit, the '066 patent, and patents not at issue in this case ("the patent portfolio"). Specifically, the October 29, 2010 agreement details that AMT grants UMS an exclusive, non-transferable, worldwide right and license to sue for infringement of the patents in suit and the '066 patent against covered entities.[8] *See* Agreement § 2.2. AMT retains the rights, title, and interest in the patents in suit with regard to itself and any other entities that were not covered entities under the agreement. *Id.* Specifically, UMS grants to AMT

> . . . the entire right, title, and interest in and to the Patents, including without limitation, all rights of UMS to sue for past, present and future infringement of the Patents, including the right to collect and receive any damages, royalties, or settlements for such infringements, all rights to sue for injunctive or other equitable relief, and any and all causes of action relating to any of the inventions or discoveries recited in the claims of the Patents, and all goodwill in connection with the foregoing.

*Id.* § 2.1. In turn, AMT grants UMS an "Exclusive License," specifically providing for

> . . . (i) an exclusive (except with respect to [AMT]), non-transferable, worldwide, right and license under the Patents to make, use, import, offer or sell the inventions or discoveries recited in the claims of the Patents; (ii) *all rights of [AMT] to sue for past, present and future infringement of the Patents by Covered Entities*, including the right to collect and receive any past, present and future damages, royalties or settlements for such infringements, all rights to sue for injunctive or other equitable relief, and any and all causes of action relating to any of the inventions or discoveries recited in the claims of the Patents[]; and (iii) the right to grant non-exclusive licenses under the Patents to any or all Covered Entities (defined below), and only to Covered Entities.

---

[8] UMS redacted the portion of the agreement that listed the covered entities.

*Id*. § 2.2 (emphasis added). The agreement further details that UMS's enforcement rights only pertain to covered entities:

> UMS agrees that it shall only file lawsuits or pursue administrative proceedings for infringement of the Patents against, or pursue licensing revenues or settlement proceeds with respect to the Patents from, Covered Entities. For avoidance of doubt, UMS shall not file lawsuits or pursue administrative proceeding for infringement of the Patents against, or pursue licensing revenues or settlement proceeds with respect to the Patents from, any entities which are not Covered Entities.

*Id*. § 2.12.

Although the agreement gives UMS the power to grant licenses associated with the patents covered by the agreement, UMS does not have the right to sell those patents to third parties. *See id.* § 2.2. UMS can, however, sublicense the patents in combination with other patents to any covered entity. *Id*. § 2.9. Before UMS grants a sublicense to a covered entity, the agreement requires that UMS and AMT agree on the portion of proceeds payable to each pursuant to the sublicense that would be attributable to the patents. *Id*.

UMS retains the right to decline to bring a lawsuit if it determines that such suit would be commercially unreasonable or impractical or otherwise unlawful or illegal. *Id*. § 9.8. UMS agrees to use its good faith efforts to bring infringement actions against covered entities that it deems to have infringed the patent portfolio to generate net receipts. *See id.* § 2.6. If it obtains recovery in connection with these lawsuits, UMS agrees to pay a royalty equal to a percentage of net receipts generated on a quarterly basis to AMT. *See id.* § 4.2. AMT agrees that it will cooperate with UMS when UMS initiates lawsuits against covered entities for infringement. *Id*. § 2.6. In connection with UMS's instituting infringement actions, the agreement states that AMT "shall join as a plaintiff at UMS's request in the event that a court

5

having jurisdiction over any particular case involving the Patents rules that [AMT] is a necessary party to an action against any Covered Entity." *Id.* § 2.6.

The agreement also contemplates a scenario where a covered entity files suit against AMT. *See id.* § 2.7. In that instance, the parties agree that UMS will initiate a patent infringement action against that covered entity if it has not already done so. *Id.* UMS also retains the right to decline to bring such a lawsuit if it determines that doing so would violate Federal Rule of Civil Procedure 11. *Id.* If, however, UMS finds that bringing suit is appropriate, AMT retains the sole right to control the litigation against the covered entity with respect to patent portfolio. *Id.* Specifically, the agreement states:

> In such case, [AMT] shall have the sole right (but will consult with UMS) to control any on going or newly initiated litigation against such Covered Entity with regard to the Patents and shall indemnify and reimburse UMS for all associated costs, expenses and liabilities of such litigation.

*Id.*

In addition, AMT maintains several rights in connection with the patents subject to the agreement. Namely, AMT reserves the right to conduct reexamination proceedings with respect to the patent portfolio. *Id.* § 2.10. AMT also retains the obligation to pay maintenance fees for the patents and to continue prosecuting any patent applications of any pending United States or foreign patent applications. *Id.* § 2.13. If a covered entity acquires a majority share of AMT, the agreement requires UMS to grant the acquiring covered entity a license to the patents subject to the agreement. *Id.* § 2.8.

AMT also reserves the right to assign all or part of its interest in the agreement and to sell or transfer all or part of the patent portfolio subject to the agreement to a third party, providing

that the third party was not a covered entity. *Id*. § 10.2. The agreement provides UMS with the right to assign its interest to its affiliate but prohibits UMS from thereafter selling or transferring ownership of that affiliate to a third party. *Id*. The agreement also details that the term of UMS's exclusive license will terminate under the earlier of the expiration of the last patent in the patent portfolio, the conclusion of UMS's enforcement actions or licensing efforts, in light of a material breach by either side, or either side's filing for bankruptcy. *See id.* §§ 9.1, 9.2, 9.3, 9.4.

## III.    The Terminal Disclaimers

On September 14, 2010, AMT executed terminal disclaimers in connection with the applications that issued as the '141 patent, the '306 patent**,** and the '313 patent. The terminal disclaimers provided that the statutory terms of any patents issued would not extend beyond the statutory term of the '066 patent. The terminal disclaimers also provided, "The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patents and any patent granted on said pending reference application are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns." *See generally* Dkt. 536–2. The '141 patent issued on November 16, 2010, and the '306 patent and the '313 patent subsequently issued on February 22, 2011. The '148 patent issued several months later on April 26, 2011. On May 2, 2011, AMT executed the same terminal disclaimer for the '148 patent as it had previously executed for the applications issuing as the '141 patent, the '306 patent, and the '313 patent.

**IV.     Lawsuits Filed Alleging Infringement of the Patents in Suit and the '066 Patent**

Between 2009 and 2012, j2 and AMT alleged in infringement actions filed in the U.S.

District Court for the Central District of California and the U.S. District Court for the District of

Colorado that AMT owned the '066 patent. UMS is not a party in these lawsuits. *See* C.D. Cal.

Case Nos. 09-cv-4014[9], 11-cv-4239, 11-cv-4686, 12-cv-3439, and D. Col. Case No. 12-cv-

00446. Specifically, in those lawsuits, AMT alleged that it was the owner, by assignment, of the

'066 patent. In the lawsuits filed in connection with the pending multidistrict litigation, UMS

alleges that it is the owner of the patents in suit. Namely, UMS alleges that it has "ownership of

all substantial rights [in the patents in suit]   . . . including the right [to] exclude others and to

enforce, sue and recover damages for past and future infringement." *See* N.D. Ill. Case No. 13 C

343.

**V.     Claim Construction Hearing**

On May 23 and 24, 2013, this court held a claim construction hearing for the patents in

suit. In response to defendants' argument that a prior claim construction from a case involving

AMT and the '066 patent bound UMS in the present case based on judicial estoppel, UMS's

counsel stated that it was a separate entity from AMT and was suing for infringement on

different patents. The court asked UMS's counsel "[w]hy would [UMS] take a different position

than the owner of the '066 patent on this issue?" UMS's counsel responded that there was no

privity between AMT and UMS. *See* Tr. at 60, 74–76.

---

[9] In this lawsuit, filed before the October 29, 2010 agreement, j2 alleged that it owned the '066 patent.

## VI.     The Legal Standard

The parties disagree over the applicable legal standard.  The UOL defendants argue that UMS's failure to conduct pre-filing investigation regarding the terminal disclaimers' effect on the patents in suit warrants dismissal of the lawsuit and an award of sanctions under Rule 11. The first and second wave defendants title their motion as a request for judgment on the pleadings under Rule 12(c).  UMS, however, argues that defendants' request is premised on an analysis of the October 29, 2010 agreement that would require the court to go beyond the scope of the pleadings and is thus a request for summary judgment under Rule 56.

Seventh Circuit precedent applies to the court's standard of review as this is a procedural issue not a substantive issue relating to patent law.  *See K-Tech. Telecomms., Inc.* v. *Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013); *Superior Indus., LLC* v. *Thor Global Enterp. Ltd.*, 700 F.3d 1287, 1291–92 (Fed. Cir. 2012).  Rule 11 allows for sanctions against a party bringing a pleading alleging claims not warranted by existing law or including facts unsupported by the evidence.  *See* Fed. R. Civ. P. 11(b)(2), (c); *Johnson* v. *Cherry*, 422 F.3d 540, 548 (7th Cir. 2005).  Rule 11 is a sanction; it is not a mechanism by which to resolve substantive legal issues in deciding whether to dispose of a claim.  *See* Fed. R. Civ. P. 11 advisory committee notes (1993 amend.) ("Rule 11 motions . . . should not be employed . . . to test the sufficiency or efficacy of allegations in the pleadings; others motions are available for those purposes."); 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1336 (2d ed. Supp. 2003) ("Rule 11 should not be used to raise issues of legal sufficiency that more properly can be disposed of by a motion to dismiss, a motion for a more definite statement, or a motion for summary judgment.").  Because the relief the UOL defendants request requires

substantive interpretation of patent law, Rule 11 is not the proper vehicle to conduct this analysis. But because the issues raised in the Rule 11 motion overlap with the first and second wave defendants' argument in their motion for judgment on the pleadings, the court will resolve the dispute on the merits first and then consider the motion for sanctions.

Moreover, the first and second wave defendants argue that the court can enter judgment under Rule 12(c) in their favor. Rule 12(c) permits a party to move for judgment on the pleadings after a complaint and answer have been filed. *See* Fed. R. Civ. P. 12(c). A court will grant judgment on the pleadings "only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Guise* v. *BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004) (internal quotation marks omitted).

UMS notes, however, that the court's resolution of the present motions requires that it construe the October 29, 2010 agreement. Because the court must go beyond the pleadings, argues UMS, it should treat the pending motions as ones for summary judgment. Indeed, Rule 12(d) provides that "[i]f, on a motion under Rule . . . 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *Rutherford* v. *Judge & Dolph Ltd.*, 707 F.3d 710, 713–14 (7th Cir. 2013). The first and second wave defendants contend that the court can decide whether UMS violated the terminal disclaimers without referring to the October 29, 2010 agreement. But, because the agreement details the ownership structure regarding the patents in suit, the court must necessarily consider it in deciding whether AMT and UMS impermissibly

split ownership of those patents in violation of the terminal disclaimers. Accordingly, the court

will treat the pending motions as ones seeking summary judgment.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). To determine whether any genuine issue of fact exists, the court must pierce the pleadings

and assess the proof that is part of the record. Fed. R. Civ. P. 56(c) & advisory committee notes

(1963 amend.). While the court must construe all facts in a light most favorable to the non-

moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or

defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.*

v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## ANALYSIS

### I.     Whether UMS Has Standing to Maintain The Current Lawsuits

Defendants contend that the October 29, 2010 agreement between AMT and UMS

effectively splits the ownership interests between the '066 patent and the terminally disclaimed

patents in violation of the terminal disclaimers. A patent, argue defendants, cannot have two

owners that choose which defendants they want to sue based on an arbitrary label. Defendants

further argue that UMS's counsel's statements during the court's claim construction hearing are

unequivocal evidence that AMT owns the '066 patent and UMS owns the terminally disclaimed

patents, resulting in the unenforceability of the latter. UMS argues that the October 29, 2010

agreement provided it an exclusive territorial license allowing it to sue for infringement against

covered entities. If it is not deemed to be an exclusive licensee, UMS argues that it is a bare licensee, and that AMT can be added as a party to the present litigation to nullify any concerns over standing to bring suit.[10]

At base, the parties dispute the ownership interest UMS received in the patents in suit in connection with the October 29, 2010 agreement, which amounts to a standing issue. The Patent Act authorizes patentees to bring lawsuits as a remedy for patent infringement. 35 U.S.C. § 281. A patentee "includes not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). A patentee seeking to sue for patent infringement must have held legal title to the patent at the time of the alleged infringement. *Rite-Hill Corp.* v. *Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc). "A conveyance of legal title by the patentee can be made only of the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States." *Id*. A transfer of any of these three interests is an assignment vesting the assignee with title in the patent, which allows the assignee to sue infringers. *State Contracting & Eng. Corp.* v. *Condotte Am., Inc.*, 346 F.3d 1057, 1062 (Fed. Cir. 2003).

A transfer of less than the aforementioned interests constitutes a license, which does not carry with it the right to bring infringement suits. *Id*. There are two types of licensees: nonexclusive licensees and exclusive licensees. *See Sicom Sys. Ltd.* v. *Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). "[A] nonexclusive license . . . confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee

---

[10] UMS requested leave to brief whether the agreement transferred all substantial rights in the patent portfolio. As both sets of defendants' briefing raised standing issues, UMS had the opportunity to address this argument. In any event, the court deems that additional briefing on whether AMT transferred all substantial rights in the patent portfolio to UMS is unnecessary.

because a nonexclusive (or 'bare') licensee suffers no legal injury from infringement."

*Intellectual Prop. Dev., Inc.* v. *TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001). An exclusive licensee retains more rights than a nonexclusive licensee but fewer than an assignee. *Sicom, Sys.*, 427 F.3d at 976. For example, an exclusive licensee may have the right to practice an invention but only in a certain territory. *Id.* An exclusive licensee lacks standing to sue on its own and must join the patent owner or its assignee in an infringement action. *See Abbott Labs.* v. *Diamedix Corp.*, 47 F.3d 1128, 1130–31 (Fed. Cir. 1995).

In determining whether a provision in a contract constitutes an assignment or a license, the court must look to the parties' intent and "examine the substance of what was granted." *Vaupel Textilmaschinen KG* v. *Meccanica Euro Italia SPA*, 944 F.2d 870, 874 (Fed. Cir. 1991). The October 29, 2010 agreement states that it is governed by California law, which provides that contracts are interpreted based on the parties' intent at the time of contracting. *See State of Cal.* v. *Allstate Ins. Co.*, 201 P.3d 1147, 1154, 45 Cal. 4th 1008, 90 Cal. Rptr. 3d 1 (2009); *Nelson* v. *Legacy Partners Residential, Inc.*, 207 Cal. App. 4th 1115, 1129, 144 Cal. Rptr. 3d 198 (2012); Cal. Civ. Code § 1636; *see also Alfred E. Mann Found. for Scientific Research* v. *Cochlear Corp.*, 604 F.3d 1354, 1359 (Fed. Cir. 2010) (interpretation of license agreement under California law is a question of law for the court). A court ascertains the parties' intent by looking to the language within the four corners of the agreement. *See Royal Thrift & Loan Co.* v. *Cnty. Escrow, Inc.*, 123 Cal. App. 4th 24, 45, 20 Cal. Rptr. 3d 37 (2004). If the terms of the contract are unambiguous, the plain meaning of the agreement governs. *See Everett* v. *State Farm Gen. Ins. Co.*, 162 Cal. App. 4th 649, 656, 75 Cal. Rptr. 3d 812 (2008); Cal. Civ. Code § 1638; *see also Israel Bio-Eng*'g *Project* v. *Amgen Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007)

("In construing the substance of the assignment, a court must carefully consider the intention of the parties and the language of the grant.").

In the October 29, 2010 agreement, UMS assigns all rights in the patents to AMT, and AMT simultaneously grants UMS an exclusive license in the patents against covered entities. The October 29, 2010 agreement details that AMT grants UMS an exclusive, non-transferable, worldwide, right and license to practice the invention in the patent portfolio and to sue for infringement against covered entities. *See* Agr. § 2.2. Specifically, AMT grants UMS "*all rights of [AMT] to sue for past, present and future infringement of the Patents by Covered Entities*, including the right to collect and receive any past, present and future damages, royalties, or settlements for such infringements, all rights to sue for injunctive or other equitable relief, and any and all causes of action relating to any of the inventions or discoveries recited in the claims of the Patents." *Id*. § 2.2 (emphasis added). The agreement specifically limits UMS's authority to sue only covered entities. *Id*. § 2.12.

Determining the type of interest conveyed to UMS in the agreement (*i.e.*, an assignment of substantially all patent rights or a license) is a question of which entity owns the patents in suit and the '066 patent such that it could maintain a lawsuit for infringement. *See Aspex Eyewear, Inc.* v. *Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006); *Prima Tek II, LLC* v. *A-Roo Co.*, 222 F.3d 1372, 1379–80 (Fed. Cir. 2000). The central determining factor is whether the transferee obtained a right to sue for infringement to enforce the patent. *Aspex Eyewear, Inc.*, 434 F.3d at 1342; *see also Vaupel*, 944 F.2d at 875–76 ("The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. This policy is not undercut

14

here because the right to sue rested solely with [the licensee]." (internal citations omitted)).

Other factors include the scope of the licensee's right to sublicense, whether the license provides

for reversion of rights to the licensor in case of material breach, the right of the licensor to

receive a portion of the recovery from infringement lawsuits brought by the licensee, the ability

of the licensor to control and oversee the licensee's activities, the obligation of the licensor to

continue paying maintenance fees, and the nature of any limits on the licensee's right to assign

its interests in the patent. *See Alfred E. Mann Found.*, 604 F.3d at 1360–61. The parties'

description of the agreement is not determinative, rather, courts look to the legal effect of the

provisions in the agreement. *See Aspex Eyewear, Inc.*, 434 F.3d at 1340.

The October 29, 2010 agreement grants UMS an exclusive worldwide license to bring

infringement suits against covered entities while AMT retains the right to sue non-covered

entities. The agreement further provides that UMS may grant sublicenses to covered entities

subject to an agreement with AMT concerning the portion of proceeds attributable to the patents

in the patent portfolio. *See, e.g.*, *Prima Tek II, LLC*, 222 F.3d at 1380 ("A licensee's right to

sub-license is an important consideration in evaluating whether a license agreement transfers all

substantial rights."). The agreement grants UMS the discretion to institute lawsuits against

covered entities, even when a covered entity sues AMT for infringement. In that situation, UMS

has discretion to determine whether bringing suit would violate Rule 11; if it would not, the

agreement requires UMS to bring a counterclaim against that covered entity. *Compare with*

*Abbott Labs.*, 47 F.3d at 1132 ("Moreover, although Abbott was given the right of first refusal in

suing alleged infringers, the agreement provides that if Diamedix asks Abbott to bring suit

against an alleged infringer and Abbott declines to do so, Diamedix has the right to prosecute its

15

own infringement action; thus, although Abbott has the option to initiate suit for infringement, it does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue."). While AMT retains the right to control the litigation in such a case, the determination about whether to file the suit still rests with UMS. That the agreement gives UMS the worldwide right to sue covered entities distinguishes it from a bare licensee, demonstrating that it is an exclusive licensee. *See Abbott Labs.*, 47 F.3d at 1131 ("[A] bare licensee, who has no right to exclude others from making, using, or selling the licensed products, has no legally recognized interest that entitles it to bring or join an infringement action."); *see also WiAV Solutions LLC* v. *Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010) ("[A] so-called 'bare licensee' holds nothing more than a promise from the patentee that the patentee will not sue the licensee for practicing the patented invention.").

AMT, however, reserves the right to bring patent infringement lawsuits *for the same patent portfolio* against different entities. "[A] patent may not have multiple separate owners for purposes of determining standing to sue." *Alfred E. Mann Found.*, 604 F.3d at 1359.[11] Indeed, "for purposes of determining standing to sue for infringement, there may not be multiple groups or unaffiliated individuals who claim ownership of the patent; one of these groups or individuals must be determined to be the owner, and that owner is the only party with standing to sue on its

---

[11] Joint inventors of an invention, however, enjoy undivided interests in the entire patent. *See Ethicon, Inc.* v. *U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). In order to sue for infringement of that patent, all co-owners must be joined together. *See Israel Bio-Eng'g. Project*, 475 F.3d at 1264–65 ("Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing. With certain exceptions, not applicable here, one co-owner has the right to limit the other co-owner's ability to sue infringers by refusing to join voluntarily in the patent infringement suit. Absent the voluntary joinder of all co-owners, a co-owner acting alone will lack standing.") (internal citations omitted).

16

own." *Id.* at 1359 n.2. "Either the licensor did not transfer 'all substantial rights' to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer 'all substantial rights' to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own." *Id.* at 1359–60. "When there is an exclusive license agreement, as opposed to a nonexclusive license agreement, but the exclusive license does not transfer enough rights to make the licensee the patent owner, either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation." *Id.* at 1360. AMT retains an unfettered right to bring lawsuits against noncovered entities for the patent portfolio. The agreement's splitting the right to sue between covered and noncovered entities evidences that AMT retains ownership rights in the patent portfolio, belying the notion that the agreement constituted an assignment. *See Asymmetrx, Inc.* v. *Biocare Med., Inc.*, 582 F.3d 1314, 1320–21 (Fed. Cir. 2009) (no assignment occurred because if the licensee refused to exercise the right to sue, the licensor could bring its own infringement action); *Sicom*, 427 F.3d at 979 (that the licensee had the right to sue for "commercial infringement" while the licensor could bring suit for "noncommercial infringement" demonstrated that the licensor retained legal title to the patent); *cf. Lucent Techs., Inc.* v. *Gateway, Inc.*, 543 F.3d 710, 721 (Fed. Cir. 2008) ("[T]he owner of a patent cannot split up its ownership rights in a patent and assign different claims to different parties." (citing *Pope Mfg. Co.* v. *Gormully & Jeffrey Mfg. Co.*, 144 U.S. 248, 252, 12 S. Ct. 641, 36 L. Ed. 423 (1892))).[12]

---

[12] UMS's alternative argument that the agreement provided it with a territorial license such that it could bring suits without joining AMT is unavailing. As pointed out in the text, a conveyance of legal title in a patent can convey three types of ownership interests: (1) a conveyance of legal title in the entire patent; (2) an undivided part or share of the entire patent; or (3) rights in the patents in a specified

Indeed, the agreement contemplates UMS's joining AMT as a party as needed to enforce the patents in the patent portfolio. It provides that AMT "shall join as a plaintiff at UMS's request in the event that a court having jurisdiction over any particular case involving the Patents rules that [AMT] is a necessary party to an action against any Covered Entity." Agr. § 2.6. There would be no need for this provision if AMT had transferred all rights in the patent portfolio to UMS. Moreover, although UMS may grant sublicenses to infringers, its ability to do so is circumscribed: UMS may only grant sublicenses to covered entities. Moreover, AMT's ability to sue noncovered infringers is not hampered by UMS's ability to grant sublicenses. *See Alfred E. Mann Found.*, 604 F.3d at 1361 (licensors' right to sue can be "rendered illusory by the licensee's ability to settle licensor-initiated litigation by granting royalty-free sublicenses"); *Speedplay, Inc.* v. *Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000) (licensee's enjoyment of patent rights was not hampered by licensor's retaining right to sue as it could grant sublicenses to accused infringers). In addition, any sublicense is subject to AMT's agreement on disbursements of proceeds.

AMT also retains other rights in addition to suing noncovered entities for patent infringement, including the right to prosecute patent applications, conduct reexamination proceedings, pay maintenance fees, and receive royalty payments from licenses granted by UMS to covered entities and a portion of any recovery from infringement actions instituted by UMS. In addition, the agreement details that UMS's exclusive license reverts back to AMT in light of a

---

geographical region. *See Rite-Hill Corp.*, 56 F.3d at 1551. UMS argues that its interest in the patent portfolio is the third type, *i.e.*, a territorial license that transferred all substantial rights in the patent allowing AMT to bring suit against covered entities. Exclusive territorial licenses, however, are measured by geographical areas, *see* 35 U.S.C. § 261, and do not encompass the license at issue here that gives a worldwide right to sue unidentified companies based on their designation as a covered entity. *See Int'l Gamco, Inc.* v. *Multimedia Games, Inc.*, 504 F.3d 1273, 1278–80 (Fed. Cir. 2007).

material breach or either side's filing for bankruptcy. AMT also reserves the right to sell or transfer all or part of the patent portfolio subject to the agreement to a third party, providing that the third party is not a covered entity. Agr. § 10.2. Because AMT retains the right to bring infringement lawsuits in connection with the patent portfolio in addition to numerous other rights associated with ownership, the agreement did not convey all substantial rights in the patent portfolio to UMS. *See Alfred E. Mann Found.*, 604 F.3d at 1361 ("Where the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee."), *id.* at 1362 ("Here, [the licensor] retained significantly greater litigation rights, because it maintained absolute control over any suit it brought in its own name."); *Asymmetrx*, 582 F.3d at 1320 (license did not transfer all substantial rights in the patent where licensor retained the right to sue in addition to reserving the right to make and use the invention, to provide the invention to government or non-profit institutions for research, retained control over the product in the commercial diagnostic field, maintained input on sublicensing, and received sublicense royalties); *Abbott Labs.*, 47 F.3d at 1132 (license was not an assignment as licensor retained the right to make, use, and sell the products, the right to bring suit if the licensee declined, and the right to prevent the licensee from assigning its right under the licenses to any party other than a successor in business); *Intellectual Prop. Dev., Inc.*, 248 F.3d at 1344–45 (agreement did not convey ownership interest because the agreement (1) did not transfer the sole right to sue other parties for infringement as licensor had to consent to the litigation when it was a necessary party and could withdraw that consent and the license and (2) restricted the licensee's ability to assign the patent); *Vaupel*, 944 F.2d at 875 (license constituted an assignment where the only rights under the patent that the licensor retained were a veto right

19

on sublicensing, the right to obtain patents on the invention in other countries, the right to receive infringement damages, and a reversionary right in the event of bankruptcy). Accordingly, as an exclusive licensee, UMS lacks standing to maintain the present lawsuits alleging infringement of the patents in suit.

## II.     Status of the Multidistrict Litigation

### A.     UMS's Standing to File Infringement Suits

A court must determine that the plaintiff has standing to bring the lawsuit, regardless of whether the parties raised the issue, as it is a jurisdictional issue. *See Paradise Creations, Inc.* v. *UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003); *Mentor H/S, Inc.* v. *Med. Device Alliance, Inc.*, 240 F.3d 1016, 1018 (Fed. Cir. 2001); *Rite-Hite Corp.*, 56 F.3d at 1551. Rule 19(a), the federal joinder rule, states that a person who can be joined as a party should be joined if (1) the person's absence would make it impossible to grant complete relief to the parties, or (2) the person claims an interest in the subject matter of the action and is so situated that the disposition of the action in his absence could impede his ability to protect that interest or leave any of the parties subject to a substantial risk of incurring multiple inconsistent obligations. Fed. R. Civ. P. 19(a). "The purpose of Rule 19–to avoid multiple suits or incomplete relief arising from the same subject matter–is thus served by joinder." *Abbott Labs.,* 47 F.3d at 1133. Here, both factors dictate that AMT must be joined as a plaintiff. First, as an exclusive licensee, UMS cannot maintain the lawsuit without joining AMT.[13] Second, as defendants note, the agreement

---

[13] Although UMS has not indicated that AMT would refuse to join the multidistrict litigation as a plaintiff, if it chose to be obstinate, UMS could seek to join AMT involuntarily. *See Asymmetrx, Inc.*, 582 F.3d at 1322 ("A patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or, in a proper case, made, an involuntary plaintiff if it is not subject to service of process." (internal quotation marks omitted)).

here raises issues about AMT's bringing future infringement actions against the same defendants now designated as covered entities but later deemed to be noncovered entities. In addition, defendants contend that AMT could bring infringement actions against their customers in the future. Joining AMT in this lawsuit would resolve these potential problems.[14]

Defendants argue that the lawsuits should be dismissed because UMS lacks standing. Dismissal for lack of standing is ordinarily without prejudice; however, a dismissal with prejudice is warranted in cases where "it [is] plainly unlikely that the plaintiff [will be] able to cure the standing problem." *See Fieldturf, Inc.* v. *Sw. Recreational Indus., Inc.*, 357 F.3d 1266, 1269 (Fed. Cir. 2004) (internal quotation marks omitted). An exclusive licensee can cure a standing problem by joining the patentee or successor in title to the patentee. *Id*. Where the licensee has been afforded the chance to cure a standing defect by joining the patentee or its successor but fails to do so, dismissal of the entire case with prejudice is appropriate. *See Sicom*, 427 F.3d at 980 (dismissal with prejudice warranted when it was the second suit dismissed for lack of standing); *Textile Prods., Inc.* v. *Mead Corp.*, 134 F.3d 1481, 1485 (Fed. Cir. 1998) ("The district court correctly dismissed the infringement claim with prejudice because [the plaintiff] had its chance to show standing and failed."). Because UMS has not been afforded the opportunity to join AMT as a plaintiff to cure the standing defect, dismissal of the pending lawsuits with prejudice is unwarranted at this time.[15]

---

[14]  Although UMS's counsel disputed at the claim construction hearing that UMS and AMT are in privity, if it is later determined that the two entities are in privity, a judgment against UMS in this case could later bind AMT, providing an additional reason to join AMT. *See, e.g.*, *Abbott Labs.*, 47 F.3d at 1133.

[15]  The UOL defendants additionally argue that equity prohibits allowing UMS to add AMT as a party. For the reasons addressed below in §II.C, the court presently declines to dismiss all of the lawsuits in the multidistrict litigation as a sanction against UMS.

### B.        The Terminal Disclaimers

Patentees who continue work on a previously patented invention or already existing

invention and subsequently seek patent protection for the improvement may face validity issues.

One such bar to patentability is the judicially-created doctrine of obvious-type double patenting,

which prevents "claims in separate applications or patents that do not recite the 'same' invention,

but nonetheless claim inventions so alike that granting both exclusive rights would effectively

extend the life of patent protection." *Perricone* v. *Medicis Pharm. Corp.*, 432 F.3d 1368, 1373

(Fed. Cir. 2005).  The doctrine prohibits claims in a second patent to issue where those claims

are patentably indistinct over earlier claims such that the later claims would be obvious or

anticipated in light of the earlier claim.  *See In re Hubbell*, 709 F.3d 1140, 1145 (Fed. Cir. 2013).

The two justifications for the doctrine are (1) to prevent an unjustified extension of the life of the

subsequent patent; and (2) to prevent multiple suits by different assignees asserting infringement

of essentially the same patented invention.  *See id*.

To obviate an obvious-type double patenting issue, a patentee may file a terminal

disclaimer, which "serves the statutory function of removing the rejection of double patenting,

and raises neither presumption nor estoppel on the merits of the rejection." *See Quad Env. Tech.*

*Corp.* v. *Union Sanitary Dist.*, 946 F.2d 870, 873 (Fed. Cir. 1991).  When filing a terminal

disclaimer, the patent holder disclaims the "portion of the second patent which would extend

beyond the expiration of the first" and in doing so, "the patentee gives up any extension of patent

protection that might have resulted." *Ortho Pharm. Corp.* v. *Smith*, 959 F.2d 936, 940 (Fed. Cir.

1992).  A terminal disclaimer filed to obviate an obvious-type double patenting issue must

"[i]nclude a provision that any patent granted on that application . . . shall be enforceable only

for and during such period that said patent is commonly owned with the application or patent which formed the basis for the judicially created double patenting." 37 C.F.R. § 1.321(c)(3). The purpose of requiring common ownership between patents subject to a terminal disclaimer is to prevent harassment by multiple assignees. *See In re Hubbell*, 709 F.3d at 1145; *In re Fallaux*, 564 F.3d 1313, 1319 (Fed. Cir. 2009); *Merck & Co.* v. *U.S. Int'l Trade Comm'n*, 774 F.2d 483, 485–86 (Fed. Cir. 1985).

AMT's filing of terminal disclaimers for the '141 patent, the '306 patent, the '313 patent, and the '148 patent limited their patent terms to that of the '066 patent. The terminal disclaimers further required that AMT or its assignee commonly own the terminally disclaimed patents and the '066 patent. Splitting ownership of a patent subject to a terminal disclaimer based on the life of the '066 patent from the '066 patent would render the former unenforceable. Here, however, as detailed, AMT and UMS did not split ownership of the '066 patent from the terminally disclaimed patents because AMT never transferred legal title of the patents to UMS. AMT is the owner of the '066 patent and the terminally disclaimed patents. That AMT granted an exclusive license with regard to the terminally disclaimed patents does not violate the terminal disclaimers.

Defendants argue that the agreement split ownership of the patent portfolio between AMT, which maintains the right to sue noncovered entities, and UMS, which retains the right to sue covered entities. This agreement, argue defendants, creates two divided ownership shares in violation of the terminal disclaimers. As found, however, the legal effect of the agreement constitutes an exclusive license giving UMS the right to maintain, *inter alia*, infringement lawsuits against covered entities; it was not a transfer of ownership. That AMT and UMS sought

to give UMS the right to bring lawsuits on its own and that UMS brought these lawsuits does not change the fact that UMS cannot do so. The agreement thus did not convey divided ownership shares in the patent portfolio. Defendants also raise UMS's counsel's statements at the claim construction hearing that AMT owned the '066 patent and that AMT and UMS are not in privity as a basis for showing that the terminal disclaimers were violated. This argument fails for the same reason as defendants' other argument. No terminal disclaimer violation occurred even if AMT and UMS are not in privity because AMT still owns the patent portfolio; in other words, that AMT and UMS are different entities is indicative of why the agreement did not split ownership rights between the patent portfolio but is not a basis to declare the patents unenforceable for violating the terminal disclaimers at this time.[16]

### C.    Sanctions

The UOL defendants argue that sanctions are appropriate in this case and warrant dismissal of UMS's lawsuits. *See* Fed. R. Civ. P. 11; 28 U.S.C. § 1927; 35 U.S.C. § 285. Indeed all defendants note how UMS, for the past two years, has instituted infringement lawsuits in federal courts across the country purporting to be the owner of all substantial rights in the patents in suit and having the right to enforce those patents. The multiplicity of these lawsuits resulted in pretrial consolidation of these cases in front of this court by the JPML. At the same time, AMT has filed lawsuits to enforce the '066 patent. Although the agreement apparently gives UMS the authority to bring lawsuits claiming infringement of the patents in suit as well as the '066 patent, UMS has not sued any of the named defendants in the present multidistrict litigation

---

[16]  The UOL defendants also seek to dismiss the claims arguing that the '074 patent is invalid based on obviousness-type double patenting and that UMS failed to adequately plead indirect infringement. These arguments are premature at this stage and the court need not consider them when resolving the present issues before it.

for infringement of the '066 patent. This litigation strategy ultimately may result in AMT's subsequently bringing lawsuits against the same defendants or their customers for infringement of the same invention through the guise of a different patent. Equally troubling is the fact that the '066 patent and the terminally disclaimed patents must be owned by the same entity, but AMT chooses to enforce the former while UMS sues for infringement of the latter. Still, at this time, the facts do not indicate that AMT and UMS impermissibly divided ownership of the patents violating the terminal disclaimers. Nor is there any indication at this time that they entered the October 29, 2010 agreement in bad faith to subvert the terminal disclaimers while secretly splitting ownership of the '066 patent from the terminally disclaimed patents.[17] Accordingly, at this time, the court concludes that sanctions against UMS are not warranted.

## CONCLUSION

The UOL defendants' motion for sanctions under Rule 11 [dkt. 536] and the first and second wave defendants' motion for judgment on the pleadings [dkt. 561] are denied. UMS is directed by October 16, 2013 to join AMT as an additional party, the entity that would allow it to maintain standing to sue defendants for infringement of the patents in suit.

ENTER:

Dated: September 25, 2013

_____
JOAN HUMPHREY LEFKOW
United States District Judge

---

[17] Indeed, numerous prior defendants settled with UMS before the UOL defendants raised the present issue regarding UMS's right to enforce the patents in suit.