**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | MDL No. 2371 |
| IN RE UNIFIED MESSAGING | ) | |
| SOLUTIONS, LLC | ) | Master Docket No. 12 C 6286 |
| PATENT LITIGATION | ) | |
| | ) | Judge Joan H. Lefkow |
| | ) | |

**AMENDED OPINION AND ORDER**

Plaintiff Unified Messaging Solutions, LLC brought suits against numerous defendants alleging infringement of five related patents. (*See* dkt. 1.) These suits were consolidated into the present multidistrict litigation. (*See id.*) Plaintiff Advanced Messaging Technologies, Inc. later joined the suit as a necessary party. (Dkts. 608, 618.)

Before the court is defendants Twitter, Inc. and Yahoo! Inc.'s motion to find this case exceptional under 35 U.S.C. § 285. (Dkts. 745, 750.) Defendants General Electric Capital Services, Inc. and BMO Harris Bank join the motion (dkts. 752, 753), and defendants Scottrade, Inc. and Orbitz LLC support it with supplemental memoranda. (Dkts. 741, 746.) For the reasons stated below, defendants' motion is granted in part and denied in part.[1]

**BACKGROUND**

The court assumes familiarity with the facts set forth in its opinion denying summary judgment and declining to impose sanctions. (Dkt. 608.) It repeats only those facts necessary for the disposition of the present motion.

---

[1] The court has jurisdiction under 28 U.S.C. § 1331.

1

I.      **Patents at Issue**

Plaintiff United Messaging Solutions, LLC ("UMS") filed multiple lawsuits against defendants alleging infringement of United States Patent Numbers 6,857,074 ("the '074 patent"), 7,836,141 ("the '141 patent"), 7,895,306 ("the '306 patent), 7,895,313 ("the '313 patent"), and 7,934,148 ("the '148 patent")—collectively the "patents in suit."

Each of the patents in suit is the result of a "continuation application," which allows a patent applicant to pursue additional claims to an invention disclosed in an earlier application. Thus, each of the five patents is based on the same invention—they simply build on that invention through additional claims. Here, the invention is a method and system for storing and managing messages, disclosed in United States Patent 6,350,066 ("the '066 Patent"). In patent vernacular, the '066 patent is the "parent patent" and the patents in suit are the "child patents."[2]

The '066 patent claims a system for receiving and storing a message signal directed to an intended recipient and for relaying that message signal to a computer. '066 Patent col.27 l.32–34. As the patent's abstract explains, a message storage and delivery system is connected to a public switched telephone network. *Id.* at [57]. The network receives incoming "calls" in the form of facsimile, voice, or data transmissions and the system detects the type of call and stores it in a database. *Id.* The system, which is also connected to the Internet, then uses a "hyper-text transfer protocol deamon" to transmit the stored message to the recipient. *Id.*

---

[2] Four out of the five patents in suit are also subject to a terminal disclaimer—an acknowledgement by the patent applicant that a later patent application discloses substantially the same invention as an earlier application. A terminal disclaimer obviates the need for a finding of double patenting (and subsequent rejection of a later patent application).

## II. Patent Assignments

In the mid-2000s, j2 Global, Inc. ("j2") acquired the '066 patent, the '074 patent, and four patent applications, which ultimately issued as the remaining patents in suit. (*See* dkt. 536-7.)

j2 assigned the '074 patent and the '306 patent to Acacia Patent Acquisition LLC, a wholly-owned subsidiary of Acacia Research Corporation, which acquires, licenses, and enforces patents. (*See id.*) j2 assigned the '066 patent and the three remaining patents to Advanced Messaging Technologies, Inc. ("AMT"), j2's wholly-owned subsidiary. Shortly after j2 assigned the '074 patent and the '306 patent to Acacia Patent Acquisition, Acacia Patent Acquisition assigned both patents to UMS, another wholly-owned subsidiary of Acacia Research Corporation. (*See id.*)

UMS then entered into an agreement with AMT. (*See* dkt. 750-5.) The agreement transferred UMS's ownership interest in the '074 patent and the '306 patent to AMT. (*Id.* § 2.1.) At the same time, it granted UMS an exclusive, non-transferrable, worldwide right and license to sue for infringement of the '066 patent and all five patents in suit. (*Id.* § 2.2.) The agreement limited that right, however, to "covered entities."[3] AMT retained the right to bring infringement actions against non-covered entities. The agreement further directed UMS to pay AMT $2 million for the right and license to sue for infringement. (*Id.* § 4.1.) It also stated that if UMS obtained a recovery in connection with those suits, UMS would pay AMT royalties. (*Id.* § 4.2.)

To summarize, j2 acquired the rights to the '066 patent and the patents in suit. j2 assigned the '074 patent and the '306 patent to Acacia Patent Acquisition and assigned the '066

---

[3] Although the agreement includes a list of covered entities, that list is redacted. (*See* dkt. 750-5 § 2.5, Ex. D.) Plaintiffs have not produced an unredacted version. Although the court does not know who the covered entities are, it assumes they are the types of entities sued in the present multidistrict litigation.

patent and the three remaining patents to its wholly-owned subsidiary, AMT. Acacia Patent Acquisition (a wholly-owned subsidiary of Acacia Research Corporation) then transferred the '074 patent and the '306 patent to UMS (another wholly-owned subsidiary of Acacia Research Corporation), which then entered into an agreement with AMT that transferred the right, title, and interest of the two patents to AMT (and thus, effectively back to j2) but gave UMS the right to sue for infringement of the '066 patent and the patents in suit against covered entities.

### III. Procedural History

Beginning in 2004, j2 brought several lawsuits in California alleging infringement of the '066 patent. j2 brought a second round of lawsuits in 2009, this time joining AMT. A few years later, UMS filed separate actions alleging infringement of the five patents in suit. UMS did not join j2 or AMT to any of these actions.

In their suits for infringement, j2 and AMT claimed ownership of the '066 patent. Because UMS never sued for infringement of the '066 patent (even though the agreement gave it the right to, at least against covered entities), it never explicitly claimed ownership of the patent. It did, however, claim to be "the exclusive licensee" of the patents in suit "with ownership of all substantial rights" in the patents, "including the right [to] exclude others and to enforce, sue and recover damages for past and future infringement." *See, e.g.*, Complaint at 6–10, *Unified Messaging Solutions LLC* v. *Google Inc., et al.*, No. 11-00464 (E.D. Tex. Sept. 7, 2011), ECF No. 1.

UMS's suits were consolidated into the present multidistrict litigation. From the start, there was confusion as to who owned the '066 patent and the patents in suit. During claim construction, defendants argued that UMS should be bound by a construction advocated by j2 in an earlier suit. UMS, however, maintained not only that it was a separate entity but that there

was no privity between it and AMT, and that therefore estoppel was improper. UMS also argued that even if there were privity, it had sued to enforce different patents.

Before the court issued its claim construction ruling, defendants Juno Online Services, Inc., NetZero, Inc., and Memory Lane, Inc. moved for sanctions.[4] (Dkt. 536.) Shortly after, both the first and second wave defendants[5] filed a motion for judgment on the pleadings. (Dkt. 561.) In the motion for sanctions, defendants argued that the patents in suit were unenforceable, as patents on variants of the same invention must be commonly owned and the agreement between UMS and AMT split ownership. (Dkt. 536.) The first and second wave defendants argued for judgment on the pleadings for the same reason. (Dkt. 561.)

The court addressed the motion for judgment on the pleadings first, which it construed as a motion for summary judgment because it forced the court to look beyond the pleadings to the agreement between UMS and AMT. (Dkt. 608 at 10–11.) The court observed that a litigant must have legal title to a patent in order to sue for infringement. (*Id.* at 12.) Thus, it reasoned, the parties' dispute of ownership of the patents in suit was really a question of standing. (*Id.*) The court then concluded that because a conveyance of legal title "can be made only of the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States," *Rite-Hill Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc), and the agreement between UMS and AMT did not involve the transfer of any one of these three interests, UMS did not have standing. The court declined to

---

[4] Defendants also moved for dismissal under Federal Rule of Civil Procedure 11, which the court explained was improper. (Dkt. 608 at 9–10.)

[5] The first wave defendants are defendants whose cases were pending before the Judicial Panel on Multidistrict Litigation consolidated pretrial proceedings. The second wave defendants are those against whom UMS filed suit after the consolidation.

dismiss the case, and instead joined AMT as a necessary party under Federal Rule of Civil Procedure 19. (Dkts. 608 at 20–21, 618.)

The court then turned to the motion for sanctions. The court observed that the plaintiffs' litigation strategy allowed them to take different positions on what is effectively the same invention through the guise of different patents. Although the court found plaintiffs' conduct troubling, it declined to impose sanctions, concluding that there was no evidence that UMS and AMT entered into the agreement in bad faith. (Dkt. 608 at 25.)

The court ruled on claim construction a few months later without addressing defendants' argument for the application of judicial estoppel. (Dkt. 639.) Plaintiffs stipulated to dismissal and appealed. (Dkts. 713, 721, 730.) Defendants brought the present motion claiming the litigation was a deliberate attempt to exact licensing fees by exploiting the judicial system. (Dkts. 745, 750.)

## LEGAL STANDARD

Section 285 of the Patent Act authorizes a district court to "award reasonable attorney fees to the prevailing party" in "exceptional cases." 35 U.S.C. § 285. Until 2005, exceptional cases were limited to those that met the Federal Circuit's strict two-part test for objective baselessness and subjective bad faith. *Brooks Furniture Mfg., Inc.* v. *Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). The Supreme Court abrogated that standard in *Octane Fitness*, expanding the definition of an exceptional case to "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC* v. *ICON Health & Fitness, Inc.*, ---U.S.---, 134 S. Ct. 1749, 1756, 188 L. Ed. 2d 816 (2014).

The Supreme Court added that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* The Court also rejected the *Brooks Furniture* requirement that the party seeking fees prove its entitlement by clear and convincing evidence. *Id.* at 1758. Under *Octane Fitness*, a preponderance of the evidence is sufficient. *Id.*

## ANALYSIS

Defendants argue that this case is exceptional because both UMS's proposed claim construction and its failure to join AMT in the first place were unreasonable.

## I. Proposed Claim Construction

Defendants give considerably more color to the facts outlined above but offer little evidence in support of their allegations. According to defendants, after its first wave of lawsuits, j2 decided to target a broader range of defendants. (Dkt. 750 at 2.) j2 (at this point joined by AMT), however, was restricted by its earlier arguments that the disclosures in the '066 patent were limited to products and services using fax-to-web technology—products that converted incoming faxes to a format suitable for retrieval on the Internet. (*Id.* at 2–3.) Their solution, according to defendants, was to assign the right to sue to Acacia Research Corporation, which defendants call "one . . . of the largest and most litigious patent assertion entities in the United States." (*Id.* at 3.) According to defendants, Acacia Research Corporation formed UMS shortly after, with the express purpose of transferring the right to bring infringement actions to the subsidiary. (*Id.*) j2 then entered into a series of agreements with Acacia Research Corporation, the final version of which was between AMT and UMS and was finalized in the fall of 2010. (*Id.* at 3–4.) As noted above, this agreement gave UMS a right and license to sue for infringement of the '066 patent and all five of the patents in suit. (*See* dkt. 750-5 § 2.2.) It also

directed UMS to pay AMT $2 million as well as 50% to 60% of any proceeds UMS generated through licensing or litigation. (*Id.* §§ 4.1–4.2.) Defendants contend that this "shell game of assignments" was a win–win for plaintiffs: j2 and AMT could bring actions against defendants in the fax-to-web industry and UMS could bring actions against a broader range of defendants and neither would be restricted by the other's litigation positions. Specifically, defendants argue that this arrangement allowed plaintiffs to advocate for different constructions of the term "messages," avoiding estoppel. (Dkt. 750 at 5.)

One of the disputed terms at claim construction was "message(s) [not including notification message(s)]." (*See* dkt. 639.) In earlier infringement actions, j2 had argued that inbound "message signals," as recited in the '066 patent, were limited to voice, fax, and data transfers. (*See, e.g.*, dkt. 745-5 at 10 ("A 'message signal' should be defined as 'a signal that can include a fax, voice, or data message.'")) At claim construction, defendants pushed for a similar interpretation, arguing that "message(s) [not including notification message(s)]" referred to an incoming message from a third-party sender received in a facsimile, audio, or data format. (*Id.* at 6.) UMS argued for a far broader construction, insisting that the term "messages" is not limited to incoming messages from third-party senders and simply refers to "communication(s) between a sender and a recipient." (*Id.*) Indeed, during the claim construction hearing UMS argued that "messages" is not even restricted to facsimile, voice, or data transmissions. (*See, e.g.*, dkt. 553 at 7:9–15 ("[T]he claims at issue in this case are directed to a groundbreaking method and system for storing and delivering messages that enable messages *of any type* to be stored in mailboxes associated with a network server." (emphasis added)).) When AMT joined the case, it adopted UMS's position. The court ruled against plaintiffs and held that although a third-party sender

8

was not required, the message must be an incoming message and must be a facsimile, voice, or data message. (Dkt. 639 at 6–11.)

Defendants argue that plaintiffs' claim construction is substantively unreasonable for two reasons—because it is "squarely at odds" with j2's prior position and because it is "baseless." (Dkt. 750 at 1.) The court is not persuaded by either argument. First, it is unclear whether the two positions *are* squarely at odds. j2 argued for a construction of the disputed term "message signal"; UMS argued for a construction of the disputed term "message(s) [not including notification message(s)]." Although the terms are similar, they are not the same—and neither are the patents to which they belong. Defendants do not adequately explain why the court should expect plaintiffs' proposed construction of these disputed terms to be the same—putting more weight in the terms' similarities than their differences. But even if the court accepted defendants' argument, it is unclear what it proves. The application of judicial estoppel requires more than a determination that positions are inconsistent. *See New Hampshire* v. *Maine*, 532 U.S. 742, 750–51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (detailing the "several factors" that inform a court's decision to apply judicial estoppel). Inconsistent positions, by themselves, do not require an application of judicial estoppel. Finally, defendants do not explain the connection between judicial estoppel—an equitable doctrine—and a substantively unreasonable litigation position. Even if the court had estopped UMS from arguing for such a broad claim construction, it is unclear how the court's decision would speak to the *substantive unreasonableness* of that claim construction.

Defendants also argue that plaintiffs' position was "meritless." (Dkt. 750 at 7.) Defendants explain that plaintiffs' proposed construction, which defendants contend "was adapted from a common English language dictionary without regard for the intrinsic evidence,"

9

exemplifies a claim construction methodology "conclusively rejected by the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320–21 (Fed. Cir. 2005)." (Dkt. 750 at 12 n.6.) *Phillips* teaches that when construing claims courts must consider a patent's specification over extrinsic sources such as encyclopedias and dictionaries. 415 F.3d at 1320–21. The Federal Circuit explained,

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* at 1321. As this court noted in its claim construction, the specification describes the type of messages received as "facsimile messages, voice messages, and data messages." (Dkt. 639 at 10.) For example, in the '074 patent, the specification refers to "facsimile, voice, and data" messages three times: it states that the storage and delivery system "encompasses the translation of facsimile, voice, and data messages"; that when using the search query form, which allows the user to search for a specific type of message, the user can indicate whether the message is a "facsimile, voice message or data file"; and that the storage and delivery system provides users with a link to recent files and clicking the link returns a "listing of all facsimile, voice, and data messages received." '074 Patent col.21 l.24, col.24 l.61, col.26 l.33. Defendants argue, therefore, that plaintiffs' claim construction was substantively unreasonable. But the *Phillips* court acknowledged that there is a fine line between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim. 415 F.3d at 1323. This is far too fine a line to draw in awarding fees under § 285. Defendants must show,

by a preponderance of the evidence, that plaintiffs' claim construction was substantively unreasonable. Characterizing it as in conflict with a Federal Circuit case warning against overreliance on dictionaries is insufficient. Furthermore, the mere fact that plaintiffs were unsuccessful does not establish that their position was substantively unreasonable. *See Raylon, LLC* v. *Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012) ("Reasonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous.").

## II.     Failure to Join AMT

Defendants also argue that this case is exceptional because UMS failed to join AMT to any of its infringement actions. Indeed, it was only after the cases were consolidated and the parties briefed and argued both a motion for sanctions and a motion for judgment on the pleadings that UMS's lack of standing and AMT's status as a necessary party were revealed. (*See* dkts. 608 at 20–21, 618.) In ruling on those motions, this court wrote,

> "This litigation strategy ultimately may result in AMT's subsequently bringing lawsuits against the same defendants or their customers for infringement of the same invention through the guise of a different patent. Equally troubling is the fact that the '066 patent and the terminally disclaimed patents must be owned by the same entity, but AMT chooses to enforce the former while UMS sues for infringement of the latter.

*Id.* at 25. UMS knew it had not been transferred ownership of the patents as would be necessary to have standing, as it asserted joint ownership in response to defendants' motion for judgment on the pleadings. (Dkt. 589 at 2.) Moreover, UMS and AMT anticipated that AMT might be required to join a case as a plaintiff if a court rules that AMT is a "necessary party." (Dkt. 750-5 § 2.6.) As the court stated in its Opinion, "There would be no need for this provision if AMT had transferred all rights in the patent portfolio to UMS." (Dkt. 608 at 18.)

11

Even if excused from not joining AMT in the first instance, UMS should have been aware that Federal Rule of Civil Procedure 19(a) would require AMT to be joined. (See Dkt 608 at 20-21.) Had AMT been joined from the start, litigation of the motion for judgment on the pleadings and for sanctions could have been avoided. But UMS did not even offer that option in response to the motions, requiring the court to discern this for itself. The court can only infer that the litigation strategy set out above motivated UMS's lack of candor and transparency.

For these reasons, the court is persuaded that UMS's conduct stands out from other cases it qualifies as exceptional under 35 U.S.C § 285—in this respect. The court will award defendants a reasonable attorney's fee for the time defendants spent presenting and briefing the motion for judgment on the pleadings and the motion for sanctions.

Defendants also contend that UMS knew it was in privity with AMT when it argued during claim construction that the parties were not in privity. (*See* dkt. 553 at 74:13–75:18.) Defendants insist that, because UMS and AMT had an agreement under which UMS would pay AMT $2 million and royalties on any proceeds from the present suit, there was a "mutuality of interest." (Dkt. 750 at 12 n.7.) The court declines to hang an award of fees on these provisions alone. As stated in the September 2013 Opinion and Order, a determination of privity could later bind AMT (dkt 608 at 21, n.14), but since AMT has been joined it is clear that AMT is bound by the judgment in any event.

## CONCLUSION

For the foregoing reasons, defendants Twitter, Inc. and Yahoo! Inc.'s motion to declare this case exceptional under 35 U.S.C. § 285 (dkt. 745, 750), joined by defendants General Electric Capital Services, Inc. and BMO Harris Bank (dkts. 752, 753), and supported by defendants Scottrade, Inc. and Orbitz LLC (dkts. 741, 746), is granted in part and denied in part.

Defendants are awarded a reasonable attorney's fee under § 285 for the portion of the litigation identified above. The parties are to proceed under LR 54.3(d).

ENTER:

Date: October 1, 2015

_____

U.S. District Judge